# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES A. ZERMAN, JR., et al.,** | : | |
| | : | **Case No. 1:04cv2493** |
| | : | |
| **Plaintiffs,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF STRONGSVILLE, OHIO, et al.,** | : | <u>**OPINION & ORDER**</u> |
| | : | |
| | : | |
| **Defendants.** | : | |

Four motions are pending before the Court in the above-captioned matter: (1) a Motion for Summary Judgment of Defendant City of Strongsville, Ohio (Doc. 23); (2) a Motion for Summary Judgment of Defendant Paul Haney (Doc. 24); (3) a Motion to Strike Defendants' Reply Briefs or, alternatively, to Strike the Affidavit of Walter Ehrnfelt attached to the City of Strongsville's Reply Brief, filed by Plaintiffs (Doc. 59); and (4) a Motion to Strike and/or Motion in Limine, filed by Defendants (Doc. 64).  All of the motions are fully briefed and ripe for adjudication.  For the reasons articulated below, the Court **GRANTS in part** and **DENIES in part** both of Defendants' Motions for Summary Judgment and **DENIES** the parties' respective Motions to Strike.

## I.    BACKGROUND

Plaintiffs Charles A. Zerman, Jr. ("Zerman"), Christopher J. Nieberding ("Nieberding"), and Neil P. Rozman ("Rozman") (collectively, "Plaintiffs") are firefighters employed by Defendant City of Strongsville, Ohio ("Strongsville," or "the City") at the Strongsville Fire Department.  Defendant Paul Haney ("Haney") was the Fire Chief at the Strongsville Fire Department during the time period

relevant to this lawsuit.  Haney retired from that position on April 3, 2005.

This lawsuit arises out of Plaintiffs' denial of a promotion in the Strongsville Fire Department and alleged retaliation for instituting legal proceedings after that denial.  Plaintiffs claim that Defendants wrongfully passed them up for promotion because of their union activities, their complaints about certain Fire Department policies and practices, and their endorsement of a Strongsville mayoral candidate.  Plaintiffs also allege that, following the denial of the promotion, they were subjected to retaliation after the union filed an unfair labor practice charge over the denial of the promotion and after Plaintiffs informed the City law director that they intended on filing the present lawsuit.  Based on these allegations, Plaintiffs assert violations of 42 U.S.C. § 1983 for deprivation of their First Amendment rights of freedom of association, freedom of speech, and the right to petition the government for redress.

The relevant facts giving rise to this lawsuit are detailed below.  Regrettably, the Court must engage in a lengthy discussion of the facts to provide full context to the issues presented in the pending motions, a necessity that is telling of the weaknesses of many of Defendants' arguments for summary judgment.  Many of the issues presented are simply too fact-laden to be appropriate for resolution by summary judgment.

### A. The Union

 Plaintiffs Zerman, Nieberding, and Rozman have been Strongsville firefighters since 1992, 1994, and 1994, respectively.  Plaintiffs are all members of the Strongsville Professional Fire Fighters Association, International Association of Firefighters Local 2882 (the "Union").  Rozman has served as President of the Union since November 2001.  Zerman is a Trustee for the Union, a position which he has held intermittently for several years.  Nieberding has been a Trustee for the

Union for six years and served as one of the Union's chief negotiators during negotiations with the City for the 2001-2003 collective bargaining agreement.[1]

Plaintiffs allege that then-Chief Haney and members of his administration viewed active Union members as troublemakers.  According to Plaintiffs and several first-hand witnesses, Haney referred to anyone who would challenge his administration, including active Union members, as the "Taliban."  Fire Captain Robert Janiak testified to the following:

> Q:    Okay.  But the Taliban -- that term was used to refer to folks in the department who challenge the administration on various things; would you say that's fair?
> A:    That's fair, yes.
> Q:    And sometimes these challenges would come through the Union, correct?
> A:    Yes.

(Janiak Dep. 36:25 - 37:7.)  Specifically, Fire Captain John Higginbotham testified at his deposition that he heard Haney refer to each of the three Plaintiffs as "part of the Taliban."  (Higginbotham Dep. 52:11-25.)  Although Haney admitted to using the term "Taliban" about "four or five times," he denied that he used it to refer to Union members and said that he did not remember if he used it in reference to any of the Plaintiffs.  (Haney Dep. 32:11-16; 34:2-21.)

In addition to these statements, Plaintiffs also offer statements from their declarations,

---

[1] Indeed, pursuant to the parties' collective bargaining agreement, all Strongsville Fire Department employees hired after 1986 and below the rank of assistant chief are required to either become members of the Union or pay a "fair share fee" as a condition of employment.  The "fair share fee" essentially covers the cost of Union representation even though the employee paying that fee has chosen not to join the Union.  As such, an employee not joining the Union pays the same fee but does not obtain the benefits and obligations of Union membership, resulting in a situation where there is "no reason not to join the union."  (Deposition of Assistant Fire Chief Greg Brown pursuant to Fed. R. Civ. P. 30(b)(6), 20:19-21; hereinafter "Brown 30(b)(6) Dep.")  Plaintiffs do not allege discrimination because of their status as Union members, a status which most, if not all, of their fellow employees share, including the firefighter who ultimately received the promotion over Plaintiffs.  Instead, Plaintiffs allege discrimination based on their status as <u>active</u> Union members.

without citing to other portions of the record, to support their contention that Haney held an anti-Union animus that played a role in Defendants' promotion decision.[2]  For example, Plaintiffs state in each of their declarations that "[i]t was well known among rank-and-file firefighters that former Chief Haney had often expressed his displeasure with fire fighters who were active in the Union." (Zerman Decl. ¶ 9.)  Zerman also states that, while he was being considered for promotion, Fire Lieutenant Michael Dorocak told him that "I have it from a reliable source that Chief Haney doesn't know if he can trust you.  He thinks you may be part of the Taliban."  (Zerman Decl. ¶ 31.)  In addition, Zerman states that Fire Captain Bakley told him that he was passed over for promotion "[b]ecause of your past union activities, and your friendships with Neil Rozman and Tony Hunt, [Haney] feels that he cannot trust you.  The perception is that your are a union troublemaker." (Zerman Decl. ¶ 44.)

Plaintiffs also allege that there were specific issues pertaining to the operation and staffing of the Fire Department on which the Union and Haney disagreed, causing tension between the parties.  The issue that Plaintiffs allege they were most active in promoting was the creation of an officer's position at one of the Strongsville fire stations - Station 5.  The position for which they advocated was a permanent lieutenant's position at Engine-5 and Medic-5, which apparently are a fire engine unit and rescue squad unit, respectively.  According to Plaintiffs,  Haney opposed the creation of a permanent lieutenant's position at Engine-5/Medic-5 because he first wanted to create

_____

[2]  These statements are among those that are the subject of Defendants' Motion to Strike, in which they claim that certain statements in Plaintiffs' affidavits are inadmissible for purposes of deciding a motion for summary judgment.  That motion will be addressed below.  Although the statements, if they are inadmissible as hearsay or for other reasons, may not be considered in the context of a summary judgment motion, some will be detailed here for the sake of completeness and to give context to the Motion to Strike.

4

the position of Battalion Chief.  Plaintiffs believed that only the permanent lieutenant's position would ensure that an officer was always with the units on emergency calls.  Plaintiffs allege that, "in a number of forums," they expressed their position against prioritizing the creation of a Battalion Chief position over implementing a permanent lieutenant's position at Engine-5/Medic-5.  (Zerman Decl. ¶ 7.)

Plaintiffs also assert that there are various other matters on which they expressed their positions, as Union officers, that drew the ire of Chief Haney, and that it was a combination of these disagreements, not one single issue, that allegedly affected their chances at the promotion.  One such issue was the endorsement of a candidate for mayor of Strongsville.  On June 18, 2003, after Plaintiffs had been denied the promotion, the Union formally endorsed City Councilman Joseph DeMio for mayor.  Although the formal endorsement did not occur until after Plaintiffs were denied the promotion, Plaintiffs state that the formal endorsement did not mark the beginning of the Union's support for DeMio, and that "it was well known among members of the Union and the Haney administration long before the Union formally endorsed Joseph DeMio for Mayor that the Union . . . was looking into becoming involved in the political process and endorsing Councilman DeMio."[3] (Zerman Decl. ¶ 36; Rozman Decl. ¶ 30; Nieberding Decl. ¶ 30.)  Plaintiffs also allege, again without citing to another portion of the record, that "[t]he talk around the Department was that then-Chief Haney was particularly angered over the Union's consideration of endorsing and ultimate endorsement of Joseph DeMio for City Mayor."  (Zerman Decl. ¶ 37.)  Zerman claims that he was approached by newly promoted Captain Jeff Branic after Plaintiffs were denied a promotion and was

_____

[3] These statements are also among those that Defendants move to strike as inadmissible. Again, they are included here for the sake of completeness. *See infra*, n. 2.

5

told, "stay away from Neil Rozman and Chris Nieberding, and stay away from this union business and backing Joe DeMio.  Even if you agree with backing DeMio, don't do anything publicly.  We need to stay on track and play the Chief's game so that we can rebuild you."  (Zerman Decl. ¶ 47.)

Haney denies that he knew that the Union was considering endorsing DeMio before the formal endorsement, and he denies that the endorsement angered him.  (Haney Dep. 102:2-20.)  He admits, however, that he "yelled" at Rozman when Rozman wore a "DeMio for Mayor" shirt to a Strongsville City Council meeting because he felt that it was a poor choice when the council was deciding budgetary issues affecting the Fire Department.  (Haney Dep. 114:14-16.)  The city council meeting occurred after the Union formally endorsed DeMio.

### B.     The Promotional Process

In June 2002, the Strongsville Fire Department posted a notice that it would be holding a promotional examination for the positions of lieutenant and captain.  The positions were available due to a vacancy in a captain's position - a lieutenant was to be promoted to the position of captain, and a rank-and-file firefighter was to be promoted to fill the position of lieutenant.  Only firefighters who had at least five years of experience - "first class firefighters" - were eligible to take the promotional examination for the lieutenant's position.

Promotional examinations in the Strongsville Fire Department are administered by the Strongsville Civil Service Commission and governed by the Commission's Rules and Regulations.  The examinations consist of a written portion and an oral portion conducted by a panel of three fire chiefs from the Ohio Fire Chiefs Association.  The three fire chiefs must be from outside of the Strongsville area.  Pursuant to the Rules and Regulations, the Strongsville Civil Service Commission certifies to the "appointing authority" - in this case, the Strongsville mayor - the names of five

individuals who receive the highest combined grades in the examination.  The mayor then selects one individual from the list of five for the promotion.

In addition to the examination procedures laid out in the Commission's Rules and Regulations, then-Chief Haney added another step to the promotional process.  Haney created an Executive Interview Staff ("EIS") that would interview the candidates with the five highest scores and recommend one candidate to the mayor for promotion.  The EIS was a six-person panel that consisted of Chief Haney and five assistant chiefs and captains.  The EIS used score sheets to evaluate the candidates, the scores from which would be added to the scores the candidates received on the Civil Service Commision's combined written and oral examination.  The points from the EIS process accounted for a total of ten percent (10%) of the potential total points.[4]  The practice was that Haney would recommend the candidate with the highest combined written, oral, and EIS scores to the mayor, but Haney could also override the recommendations of the EIS if he chose to do so. (Brown 30(b)(6) Dep. 38:4-7.)  According to a letter sent from Haney to then-Mayor Walter Ehrnfelt, the EIS used the following areas of criteria in assigning points to the candidates: (1) communication; (2) loyalty/ethics/values; (3) technical skills and education; (4) results; and (5) enthusiasm and attitude.  Haney admits that the EIS process was subjective. (Haney Dep. 160:1-10.)

Prior to the establishment of the EIS, Haney recommended candidates for promotion to the mayor without the formal input of other officers.  Haney explained that he created the EIS in an attempt to make the process "fairer and equal" after a previous candidate challenged the promotional

---

[4] After the oral and written examinations, candidates had a score out of a possible of ninety (90) points.  The EIS gave candidates a score of between one and ten (1-10), so that each candidate arrived at a score out of 100 potential points.

procedure in federal court, claiming Haney had a personal bias against him.[5]  Although the Strongsville Civil Service Commission's Rules and Regulations do not provide for a formal recommendation from the fire chief to the mayor, Haney explained that the mayor asked for his recommendation and, after the previous lawsuit, Haney felt that the creation of the EIS was the fairest way to provide it.  (Haney Dep. 50:23-24; 86:9-10.)  Haney also explained that, while he believed that his recommendation was "important to someone getting a promotion," the mayor did not always take the recommendation and a "few times" chose someone else.  (Haney Dep. 59:22 - 60:2; 60:19-25.)

Zerman, Nieberding, and Rozman were three of eleven firefighters who took the promotional examination, which occurred on September 10, 2002 (written portion) and November 3, 2002 (oral portion).  After taking both examinations, Zerman ranked first, Nieberding ranked second, and Rozman ranked third in combined score out of eleven applicants.  Being in the top five, each Plaintiff was eligible for promotion and was scheduled to interview with the EIS.

On January 30, 2003, the EIS conducted interviews of the top five firefighters, which included Zerman, Nieberding, Rozman, Mathew Tilbert (fourth), and David Yeager (fifth).  The EIS consisted of then-Chief Haney, Assistant Chiefs Robert Moody and Greg Brown, and Fire Captains Janiak, Higginbotham, and Bakley.  Following the EIS interview, Mayor Ehrnfelt personally interviewed each of the five candidates around March 2003.  Haney also participated in the interview with each candidate.  Thereafter, in a letter dated May 6, 2003, Haney recommended to Mayor Ehrnfelt that Tilbert be promoted to the rank of lieutenant and that Jeff Branic be promoted to the

---

[5]  That lawsuit did not involve any allegation of anti-Union bias.  *See D'Amico v. City of Strongsville, Ohio*, 59 Fed. Appx. 675 (6th Cir. 2003).

rank of captain.  Tilbert had ranked fourth in the Civil Service examination among those seeking to be promoted to the rank of lieutenant and Branic had ranked first among those seeking to be promoted to the rank of captain.  Plaintiffs allege that Tilbert was a former Union trustee but that he allowed his office with the Union to lapse and refused nomination to another term prior to taking the promotional examination.

Mayor Ehrnfelt, however, never had the opportunity to officially promote any of the candidates.  On May 25, 2003, Mayor Ehrnfelt died before he selected a candidate for promotion. Two days later, Strongsville City Council President Raymond Haseley assumed the role of acting mayor until the election of a permanent mayor in November 2003.  Acting Mayor Haseley testified that he discovered unsigned letters on Mayor Ehrnfelt's desk, dated May 20, 2003 and addressed to Tilbert and Branic to inform them of the promotion.  (Haseley Dep. 29:17-24.)  Only the unsigned letter to rising-Captain Branic, however, was produced in discovery at the time of Haseley's deposition.  Acting Mayor Haseley signed that letter and sent it to Branic on May 27, 2003.  A new letter, dated June 3, 2003 and signed by acting Mayor Haseley, was sent to Tilbert to inform him that he had been selected for the promotion.  Acting Mayor Haseley ascertained former-Mayor Ehrnfelt's intent to promote Tilbert and Branic based on the two letters he found on Ehrnfelt's desk; however, he also spoke with Assistant Chief Brown, who was on the EIS, to get more background on the candidates.  Acting Mayor Haseley testified that he was aware that Haney had recommended Tilbert and Branic to be promoted and that he did not look at the performance evaluations before he effectuated the promotion.  (Haseley Dep. 35:22 - 36:18).  Although he assumed that it was an option to change the decision, he also stated that "this was something that I took for granted that the mayor had done, otherwise he wouldn't have made the decision." (Haseley Dep. 32:4-11; 36:11-15).

9

Ultimately, Tilbert was promoted to lieutenant.

Tilbert had ranked fourth overall on the combined oral and written examination conducted by the Strongsville Civil Service Commission and ranked eleventh out of eleven on the oral portion of the exam.  In addition, only one other candidate of the eleven who took the test had <u>less</u> seniority than Tilbert.  On the other hand, Zerman, Nieberding, and Rozman all scored higher and had more seniority and experience than Tilbert in the Strongsville Fire Department.  In addition, Zerman had experience as "Acting Fire Lieutenant" from January 2003 to June 2003, a position that required him to assume the responsibilities of a lieutenant, the position to which Plaintiffs sought promotion.

### C.    Events after denial of promotion

On June 4, 2003, Plaintiffs learned that they did not receive the promotion.  On June 17, 2003, Rozman, on behalf of the Union, sent a letter to Assistant Chief Brown requesting the EIS scoring sheets.  Brown replied by letter dated June 20, 2003 that the sheets were not available because "the City does not deem it necessary to retain completed records after they are utilized." (Brown Dep., Ex. 24; Doc. 56-12 at p. 7.)  Brown also testified at his deposition that he shredded the scoring sheets, despite admitting that the Strongsville Records Commission requires personnel records to be maintained permanently and admitting that "the promotional process is part of the personnel process."  (Brown 30(b)(6) Dep. 64:14-20; 66:14-15; 68:3-6.)

On August 22, 2003, the Union filed an unfair labor practice (ULP) charge with the Ohio State Employment Relations Board (SERB) alleging improper denial of promotion based on Plaintiffs' Union activity.  In late November 2003, Rozman, as Union President, met with Haney to attempt to resolve the dispute informally.  At Rozman's request, Captain Higginbotham participated in the meeting as a neutral party.  The meeting was unsuccessful because Haney felt that

10

Rozman was blackmailing him by threatening to file a lawsuit unless two of the Plaintiffs received promotions. (Haney Dep. 106:15 - 109:4.)  Higginbotham testified at his deposition that, after the meeting, Haney told him he wanted to talk with the Strongsville City Law Director about disciplining Rozman, and possibly terminating him, for his discussions at the meeting. Higginbotham shared Haney's comments with Rozman.

The ultimate result of the ULP charge was a Final Opinion and Award issued by the arbitrator on January 11, 2006, reflecting that the parties agreed to modify the Strongsville Fire Department's promotion procedure to "add transparency and objectivity to the process."  (Doc. 64-2 at p. 15.) Most significant were the changes that (1) any promotions would be made from the top three scores on the Civil Service examination rather than the top five and (2) when any candidate other than the highest ranking candidate was selected, the higher ranked candidates were to be given written reasons for the decision.  In addition to the Final Opinion and Award, the arbitrator also issued an interim Opinion and Award in May 2005.  Included in the May 2005 opinion were the findings that "[t]he record supports a finding that there is a reasonable probability that there is some anti-union animus present in parts of the Department" and that "[a] reasonable person reading the record can reach the conclusion that the top candidates on the promotion list were discriminated against." (Doc. 29-37 at 10, 16.)

On October 1, 2004, Plaintiffs' counsel notified the Strongsville City Law Director that Plaintiffs planned on filing the present lawsuit.  That same month, both Zerman and Nieberding received performance evaluations from supervising lieutenants and captains.  Zerman received an "above standard" overall rating for the year 2004, the same rating he had received for the years 2001, 2002, and 2003.   He also received comments, however, that he needed to work on his

11

communication with management and to work through unpopular decisions by the administration. Nieberding received a "meets standard" rating for 2003 and 2004, a rating he received only once before, in 2001. Although firefighters have an opportunity to submit comments on their evaluations, Nieberding only did so for his 2003 evaluation, admitting that he felt his 2004 evaluation was "fair." (Nieberding Dep. 23:2-5.) In his 2003 evaluation, Nieberding took issue with the comment that he would benefit from continuing education in certain areas. Plaintiffs allege that these "negative" evaluations were retaliation for their past actions, including their notice to the City Law Director of their intent to file the present lawsuit.

On December 20, 2004, Plaintiffs filed this lawsuit against the City of Strongsville and Chief Haney in his individual and official capacities. Both the City of Strongsville and Haney filed Motions for Summary Judgment on December 2, 2005. After those motions were fully briefed, Plaintiffs filed a Motion to Strike Defendants' reply briefs as untimely or, alternatively, to strike an affidavit of former Mayor Ehrnfelt attached to the City's reply brief. Thereafter, Defendants filed a Motion to Strike and/or a Motion in Limine to strike or exclude portions of declarations submitted by Plaintiffs that contain hearsay or testimony based on speculation or rumor. The Court now addresses those motions.

## II.    DISCUSSION

Before turning to the Defendants' respective Motions for Summary Judgment, the Court first addresses the parties' Motions to Strike, as resolution of those motions determines the scope of evidence the Court may consider in resolving Defendants' Motions for Summary Judgment.

### A.    Plaintiffs' Motion to Strike

Plaintiffs seek to strike, as untimely, the reply briefs of Defendants City of Strongsville and

12

Haney, which were filed on February 15, 2006 and February 16, 2006, respectively.  Plaintiffs state that, at the latest, those briefs were due on February 13, 2006 and February 14, 2006, making them both two days late.   Alternatively, Plaintiffs seek to strike the affidavit of deceased Mayor Walter Ehrnfelt, which was attached to the City of Strongsville's reply brief.  This affidavit was prepared in 1999 for previous litigation brought against the City of Strongsville and was not produced in discovery in the present case, despite Plaintiffs' contention that this affidavit was clearly contemplated by Plaintiffs' discovery requests.

As an initial matter, while some courts have employed Federal Rule of Civil Procedure 12(f), for example, to strike an affidavit or a brief, or portions thereof, there is no basis in the Federal Rules for doing so.  *McLaughlin v.  Copeland,* 435 F. Supp. 513 (D.C. Md. 1977).  In fact, a decision in this district, affirmed by the Sixth Circuit Court of Appeals, refused to employ Rule 12(f) to strike an affidavit because "the rule relates only to pleadings and is inapplicable to other filings." *Dawson v. City of Kent,* 682 F. Supp. 920 (N.D. Ohio 1988), *affirmed,* 865 F.2d 257 (6th Cir. 1988).  As such, a motion to strike is not the proper vehicle for Plaintiffs' request.  For that reason alone, Plaintiffs' motion must be denied.

Although the Court will not strike the requested items from the record, the question remains as to whether the Court should consider the reply briefs and the Ehrnfelt affidavit.  As to the reply briefs, they were filed two days late.  Defendants explain that they simply must have miscounted the calendar days.  Defendants also point out that Plaintiffs requested an extension of twenty days to file their briefs in opposition to Defendants' respective Motions for Summary Judgment, a request to which Defendants agreed.  Given those circumstances, the Court does not find it appropriate to discount Defendants' reply briefs in this case.

As to the Ehrnfelt affidavit, the Court agrees with Plaintiffs that it is not plausible that counsel for Defendants, who represented the City in the previous litigation for which the affidavit was prepared, did not have or remember this affidavit until filing the reply briefs in this case. Indeed, both litigations specifically related to the promotion process at the Strongsville Fire Department. Although Defendants failed to produce this affidavit in response to requests that arguably contemplated its disclosure, the Court finds such failure to be harmless in this case. Plaintiffs cite Rule 37(c)(1) of the Federal Rules of Civil Procedure, which provides that a party that unjustifiably fails to disclose information required by Rule 26(a) or (e)(1), "is not, <u>unless such failure is harmless</u>, permitted to use as evidence . . . on a motion any . . . information not so disclosed." (emphasis added).

In this case, the City uses the Ehrnfelt affidavit to support assertions made in its reply brief that Mayor Ehrnfelt had a long-standing practice of personally interviewing candidates for promotion, that Mayor Ehrnfelt did not always select the highest ranking candidate, and that one candidate in particular, Mike Herb, was selected for captain above those who scored higher. Defendants also make those same assertions in their Motion for Summary Judgment, assertions which Plaintiffs do not contest. In addition, the strength of these assertions does not materially affect the Court's opinion, nor does it appear that, if Plaintiffs had prior knowledge of the affidavit, they would have altered their litigation strategy. Further, the affidavit was available publicly on both the district court and court of appeals dockets and was used in a case of which Plaintiffs were aware. Defendants' failure to produce the affidavit, therefore, is harmless in this case.[6]

---

[6] At this stage of the proceedings, the Court expresses no opinion regarding the potential use of this affidavit at trial.

14

For those reasons, Plaintiffs' Motion to Strike must be denied.

**B.     Defendants' Motion to Strike**

Defendants move the Court to strike those portions of the affidavits submitted by Plaintiffs that contain hearsay or "testimony based upon speculation and rumor, which does not have a proper foundation and does not come from personal knowledge." (Doc.64-1 at 1.)   Additionally and alternatively, Defendants move the Court, in limine, to exclude that testimony from evidence if the case ultimately proceeds to trial.  In opposition, Plaintiffs argue that Defendants' motion to strike is untimely because Rule 12(f) requires a motion to strike to be made within twenty days after service of a pleading, and Defendants' Motion to Strike was filed almost three months after Plaintiffs' opposition to Defendants' Motions for Summary Judgment.  Plaintiffs' also argue that any motion in limine is premature as there is no current trial order in this matter.[7]   Significantly, Plaintiffs do <u>not</u> attempt to argue that any of the statements characterized by Defendants as hearsay or rumor are otherwise admissible.

As stated above, Rule 12(f) is, by its own express language, directed at the pleadings and has been held inapplicable to other filings.  *Dawson,* 682 F. Supp. at 922.  Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, however, a court may only consider such facts as would be admissible at trial.  The Court, therefore, has excluded from its consideration those portions of the affidavits that are hearsay, not based on personal knowledge, irrelevant, or otherwise inadmissible. As to Defendants' alternative Motion in Limine, in which Defendants seek to exclude inadmissible portions of the affidavits at trial, if one occurs, the Court declines to address that motion because it

---

[7] The Trial Order issued in this matter on September 27, 2005 was vacated on April 6, 2006 due to the Court's consideration of Defendants' Motions for Summary Judgment.

is premature.  If this matter proceeds to trial, and if Defendants wish to reassert that argument, they may do so in a new motion at the appropriate time as set by this Court's forthcoming trial order.

### C.    Defendants' Motions for Summary Judgment

Both the City of Strongsville and Haney have filed separate motions for summary judgment, each addressing different claims brought by Plaintiffs but each adopting and incorporating the other motion.  For the sake of clarity and conciseness, the Court will address Defendants' motions together and will organize the arguments by each of the four counts that Plaintiffs assert.

As mentioned at the outset of this opinion, Plaintiffs assert four counts under 42 U.S.C. § 1983 (hereinafter, "§ 1983") for violation of their First Amendment rights of freedom of association, freedom of speech, and the right to petition the government for redress.  In Count I, Plaintiffs allege that their right to freedom of association was violated because, as a result of their Union activities, they were denied a promotion, threatened with retaliation on the job, and were subjected to efforts encouraging them to disaffiliate with the Union.  In Count II, Plaintiffs allege that their right to freedom of speech was violated when, as a result of their speaking out on various issues and their endorsement of Councilman DeMio for mayor, they were denied a promotion, threatened with retaliation on the job, and were subjected to efforts to silence their speech.  In Count III, Plaintiffs claim that their right to petition the government for redress was violated when, after they filed the ULP charge with the SERB for improper denial of a promotion, they were denied a promotion, threatened with retaliation on the job, and were subjected to "extreme scrutiny" on a daily basis.[8]

_____

[8] The Court recognizes the logical impossibility that a ULP charge challenging a denial of a promotion and filed after a denial of promotion can be an alleged improper cause of the very denial that the ULP charge challenges.  Nonetheless, the Court reiterates Plaintiffs' allegations here for the sake of completeness.

Finally, in Count IV, Plaintiffs allege that their right to petition the government for redress was violated when, as a result of their notification to the Strongsville City Law Director that they intended to file this lawsuit, Plaintiffs Zerman and Nieberding received negative performance evaluations, and all Plaintiffs were denied a promotion, threatened with retaliation on the job, and subjected to "extreme scrutiny" on a daily basis.

### 1.      Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909

17

F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome

of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).

 Summary judgment is appropriate whenever the non-moving party fails to make a showing

sufficient to establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft

of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir.

1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving

party is under an affirmative duty to point out specific facts in the record as it has been established

which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D.

Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary

judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt

as to material facts. *Id.*

   **2.**  **Applicable Law**

 Although Plaintiffs' causes of action arise under different clauses of the First Amendment -

Association Clause, Free Speech Clause, and Petition Clause - the same legal analysis applies to all

of Plaintiffs' claims.  The Sixth Circuit analyzes retaliation claims under all clauses of the First

Amendment pursuant to the standards developed for claims arising under the Free Speech Clause.

The Court has explained that, "[b]ecause the analytic tools for adjudicating First Amendment

retaliation claims under the Free Speech Clause have been so extensively developed, courts in this

and other circuits have tended to import fully that reasoning when litigants have characterized their

claims as arising under another First Amendment clause." *Thaddeus-X v. Blatter*, 175 F.3d 378, 390

18

(6th Cir. 1999).  This Court, therefore, applies the legal analysis employed in Free Speech Clause claims to all of Plaintiffs' claims.

To establish a First Amendment retaliation claim, a plaintiff must prove three elements:  (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.  *Id.* at 394 (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)).

In addition, because this case, as with many First Amendment retaliation cases, arises in a public employment context, the first element requires further discussion.  That is, in the context of public employment, Supreme Court jurisprudence directs that a plaintiff's underlying activity must involve a "matter of public concern" in order to fall under the protection of the First Amendment. *Connick v. Myers*, 461 U.S. 138, 146 (1983).  If the Court concludes that a plaintiff's activity does not involve a matter of public concern, then it does not warrant First Amendment protection and the Court's inquiry is over.  If, on the other hand, the Court determines that it does implicate a matter of public concern, then the Court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968).  The Supreme Court has emphasized that "this [public concern] language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at

19

143.

"Whether speech addresses a matter of public concern is a question of law, 'determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Chappel v. Montgomery County Fire Protection District No. 1*, 131 F.3d 564, 574 (6th Cir. 1997) (quoting *Connick*, 461 U.S. at 147-48).  For speech to be deemed to address a matter of public concern, "this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community."  *Id.* (quoting *Rahn v. Drake Center, Inc.*, 31 F.3d 407, 412 (6th Cir. 1994)).

In addition, in order to hold a municipality - like the City of Strongsville - liable under § 1983, a plaintiff must establish that a municipality's official policy or custom caused a constitutional violation.  *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658 (1978).   A single decision of a policymaker can, in some circumstances,  constitute an "official policy" for purposes of municipal liability.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1985) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.").  However, "municipal liability attaches only where the decisionmaker possesses <u>final authority</u> to establish municipal policy with respect to the action ordered."  *Id.* at 482 (emphasis added).  To determine whether a particular official is vested with final authority to make municipal policy, the Court must resort to state law, including valid local ordinances and regulations. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988).  With these concepts in mind, the Court

20

turns to the parties' arguments.[9]

### 3.     Plaintiffs' Claims

#### a.     Count I - Freedom of Association

In Count I, Plaintiffs allege that their right to freedom of association was violated because, as a result of their Union activities, they were denied a promotion, threatened with retaliation on the job, and were subjected to efforts encouraging them to disaffiliate with the Union.  As to Count I, the Court finds that there are genuine issues of material fact that preclude granting summary judgment in Defendants' favor.

As discussed above, the elements for a First Amendment retaliation claim are: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action

---

[9] In addition to the legal principles laid out in this section, it is worth noting that the Supreme Court recently issued a significant opinion addressing a First Amendment retaliation claim in the public employment context.  *See Garcetti v. Ceballos*, 126 S. Ct. 1951 (May 30, 2006).  In *Garcetti*, the Court held that speech by a government employee pursuant to his or her employment duties is not speech by a citizen on a matter of public concern and, consequently, not protected by the First Amendment.  *Id.* at 1961 ("Proper application of our precedents thus leads us to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.").  The Supreme Court issued *Garcetti* after the parties in the present case submitted their briefs in connection with Defendants' Motions for Summary Judgment, and none of the parties sought to submit supplemental briefs to argue the applicability of *Garcetti* to this case - i.e., to argue whether Plaintiffs' speech in this case was made pursuant to their employment duties.  Perhaps the lack of supplemental briefing on the issue indicates Defendants' acknowledgment that such an argument cannot be made in this case, an acknowledgment that this Court believes has merit.  Although some legal analysts appear to be interpreting *Garcetti* as holding that statements made by public employees will never be protected if the employee is acting within the scope of his or her employment while making the statements, this Court interprets *Garcetti* more narrowly.  The preliminary analysis is one of "job relatedness."  If the public employee's speech was required by his or her job, then *Garcetti* applies and the statements are not protected speech.  In the present case, however, it is difficult to see how any of the allegedly protected speech in which Plaintiffs engaged was required by their jobs as firefighters.  Absent a compelling argument otherwise, the Court is not willing to conclude that the speech was, in fact, job related or somehow required by their jobs. The Court finds, therefore, that *Garcetti* does not govern this case.

21

caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Id.* at 394 (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)).

###          i.          First Element - Constitutionally Protected Activity

As to the first element, Defendants argue that Plaintiffs' Union activity was not constitutionally protected because it did not relate to a matter of public concern. In support of that assertion, Defendants rest their argument almost entirely on the following passage: "An employee's speech, activity or association, <u>merely</u> because it is union-related, does not touch on a matter of public concern." *Anderson v. Ravenna Twp. Fire Dep't*, 159 Fed. Appx. 619, 625 (6th Cir. 2005) (citing *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003) (citing *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985)) (emphasis added). Defendants' argument, however, carries little weight.

First, the passage Defendants rely on is a quote first made by the Sixth Circuit in 1985 in *Boals*, in which the Court, only two sentences later, made the following finding: "We have no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering*." *Boals*, 775 F.2d at 693. This Court reads those two statements in *Boals* as suggesting that speech or activity must be more than just tangentially or peripherally related to union matters to be considered speech or association affecting matters of public concern, but that "membership in and support of a union" do sufficiently implicate matters of public concern. In this case, Plaintiffs' activities as officers of the Union - including as Union president and Union trustees - in collective bargaining agreements and public safety issues is much more than activity that is "merely" union-related.

22

Second, although the Court in *Anderson* concluded that the union-related speech at issue in that case was not speech on a matter of public concern, that case does not compel a similar conclusion here.  *Anderson* is an unpublished decision that was primarily an age and sex-based harassment case.  In addition, the Court in *Anderson* noted that "Anderson provides <u>no support or even an argument</u> for how his discussions with [a co-worker] regarding the organization of a union constituted a matter of public concern." *Anderson*, 159 Fed. Appx. at 625 (emphasis added).  Unlike the plaintiff in *Anderson*, Plaintiffs in this case have provided ample support and argument that their Union activities constitute speech, and, more specifically association, on a matter of public concern, including that they acted in the interest of firefighter safety and public safety, areas that "extend beyond internal labor relations." *Milliron v. Louisville & Jefferson County Metro. Sewer Dist.*, 867 F.Supp. 559, 563 (W.D. Ky. 1995).  The Court concludes, therefore, that Plaintiffs' Union activity, membership, and support constitute speech and associational activities on matters of public concern, retaliation for which violates the First Amendment.[10]

### ii.    Second Element - Adverse Action

The second element of Plaintiffs' claim is that they suffered an "adverse action" that would likely chill a person of ordinary firmness from continuing to engage in the protected activity.  There is no dispute that the failure to promote is an "adverse action" for purposes of a First Amendment

---

[10]  Defendants do not argue the second step of the *Pickering* and *Connick* analysis, whether the Court should balance in their favor the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968).  Because Defendants have not presented any evidence regarding a disruption in the workplace allegedly caused by Union membership, the Court need not proceed to the balancing stage of *Pickering*.  *Gordon v. City of Kansas City*, 241 F.3d 997, 1003 (8th Cir. 2001).

23

retaliation claim.  *See Thaddeus-X*, 175 F.3d at 396 ("The term 'adverse action' [in the retaliation context] is drawn from employment case law; examples in that context include discharge, demotions, refusal to hire, nonrenewal of contracts, and <u>failure to promote</u>." (emphasis added)).  As such, Plaintiffs' have satisfied the second element of their claim.[11]

### iii.    Third Element - Causation

As to the third element - that the adverse action was motivated, at least in part, by Plaintiffs' constitutionally protected activity - the Court first notes that, generally, causation is an issue that must be decided by the jury.  *Matulin v. Village of Lodi*, 862 F.2d 606, 613 (6th Cir. 1988) ("The matter of causation is an issue of fact which must be decided by the jury."); *Hadad v. Croucher*, 970 F.Supp. 1227, 1241 (N.D. Ohio 1997).  As to this element, Defendants argue that the City of Strongsville cannot be held liable because there is no evidence that former-Mayor Ehrnfelt or Acting Mayor Haseley denied Plaintiffs the promotion because of their Union activities.[12]  Defendants point out that most, if not all, of Plaintiffs' evidence regarding Defendants' anti-Union bias relates solely to Haney, not to either of the mayors.  Defendants assert, therefore, that the lack of evidence regarding the mayor precludes Plaintiffs' claims against the City of Strongsville because there is no

---

[11]  Because the Court finds that denial of a promotion is an "adverse action" and that this portion of Count I survives summary judgment, the Court does not address whether the two other adverse actions alleged by Plaintiffs - being threatened with retaliation and being encouraged to disaffiliate with the Union - also constitute "adverse actions."

[12]  The parties do not dispute that the Strongsville mayor had final decisionmaking authority regarding promotions in the Strongsville Fire Department.  Pursuant to *Pembaur*, therefore, municipal liability may be imposed on the City of Strongsville even for a single decision by the mayor regarding Plaintiffs' promotion.  *Pembaur*, 475 U.S. at 482 ("municipal liability attaches only where the decisionmaker possesses <u>final authority</u> to establish municipal policy with respect to the action ordered." (emphasis added)).  In addition, there is a reasonable debate as to whether Mayor Ehrnfelt and/or acting Mayor Haseley delegated decisionmaking authority to Haney, discussed *infra* at n. 13.

support for the third element of a retaliation claim - that Defendants' adverse action against Plaintiffs was <u>motivated</u> by Plaintiffs' constitutionally protected activity.  Defendants' argument, however, is not entirely accurate and, in any event, misses the point.

First, Plaintiffs have presented <u>some</u> evidence, although minimal, from which a reasonable jury, when considering it in connection with other evidence, may be able to infer that Mayor Ehrnfelt and/or Mayor Haseley had negative feelings toward the Union that influenced their promotion decision.  For example, former Union president George Lange testified at his deposition to the following:

> Q:    I see.  In all your years of dealing with Mayor Ehrnfelt, do you have any evidence that he was against your Union?
> A:    Nothing in writing, <u>but behind closed doors</u>.

(Lange Dep. 25:6-9) (emphasis added).  Further, Acting Mayor Haseley testified to the following at his deposition:

> Q:    Did you know the third ranked candidate, Neil Rozman, was president of the union?
> A:    I may have.  That wouldn't have affected any decision.
> Q:    Do you know Neil Rozman?
> A:    Yes, I know who he is.  We're not friends either.
> Q:    You know he's union president, correct?
> A:    Yes.

(Haseley Dep. 38:22 - 39:4).

And, Haseley conceded that he assumed long before the Union did so that the Union would support DeMio in the election for mayor.  Although this evidence does little more than suggest that Mayor Ehrnfelt <u>may</u> have expressed anti-Union sentiments in private conversations and that Acting Mayor Haseley knew that Rozman was Union president and disliked him, when considered in connection with other evidence presented by Plaintiffs, could cause a reasonable jury to conclude

25

that one or both mayors based their promotion decision on improper considerations.

More significant, however, is that Defendants' argument misses the point. The key inquiry in resolving this issue is not whether Mayors Ehrnfelt or Haseley personally held an anti-Union animus or personally acted out of a motivation to retaliate against Plaintiffs for their speech or associational activities (although some evidence may support that assertion). In certain circumstances, animus held by a subordinate official may be imputed to an otherwise neutral decisionmaker. Those circumstances occur where a subordinate official has "so influenced" a policymaker's decision that the policymaker "could not make an independent decision." *Russo v. Budd*, 95 Fed. Appx. 140, 144 (6th Cir. 2004) ("[t]o survive summary judgment, plaintiff was required to show some evidence either that [the subordinate official] possessed authority to fire him or that [the subordinate official] has so influenced [the decisionmaker's] decision that [the decisionmaker] could not make an independent decision."). The key inquiry, therefore, is whether Haney so influenced the mayor's decision to deny Plaintiffs the promotion that it cannot be said that the mayor made an "independent decision."[13] Because there are genuine issues of material fact that surround that critical inquiry, summary judgment cannot be granted in Defendants' favor on this

---

[13] It is clear that there are factual issues regarding Haney's anti-Union animus such that, if it was determined that Haney influenced the decisionmaker to the requisite extent, summary judgment would not be appropriate on this issue. Indeed, Defendants do not attempt to argue that there is no issue of fact as to whether Haney held an anti-Union animus, possibly recognizing that at least a genuine issue exists. For example, there is evidence that Haney referred to each Plaintiff as part of the "Taliban," a term which several Fire Department personnel testified was used derogatorily to refer to troublemakers or active Union members. Taken with other evidence presented, such as the fact that Haney utilized subjective criteria in the EIS process that measured qualities such as "loyalty" and "attitude," and the fact that the EIS score sheets were shredded despite state procedures recommending against such action, there is at least a genuine issue that Haney held an anti-Union animus that improperly tainted the promotion decision, if, as mentioned above, it is determined that Haney had authority or influence over that decision.

basis.

Importantly, Haney testified at his deposition that Mayor Ehrnfelt solicited Haney's recommendation for promotions.  (Haney Dep. 50:21-24.)  Such solicitation suggests that Mayor Ehrnfelt at least valued Haney's input, and, possibly, placed heavy, if not absolute, reliance upon it, which makes perfect sense because Haney is in a far superior position to evaluate the performance of Fire Department employees.   Haney testified at his deposition that he believed that his recommendation was "important to someone getting a promotion," but he also testified that the mayor did not always take the recommendation and a "few times" chose someone else.  (Haney Dep. 59:22 - 60:2; 60:19-25.)  Significantly, in the present case, Haney's recommendation of Tilbert - the candidate who ranked fourth out of the five eligible firefighters and had less seniority than the others - ultimately carried the day.  The extent to which that recommendation influenced the final decision is an issue of fact that is appropriately left for a jury's determination.

Defendants attempt to insulate the mayor's decision from Haney's influence by arguing that Mayor Ehrnfelt personally interviewed each candidate.  That alone, however, is not enough to find in the City's favor as a matter of law.  In *Russo v. Budd*, *supra*, a plaintiff brought suit under § 1983, claiming that he was terminated from his position as deputy sheriff in retaliation for engaging in protected political association.  His only evidence as to an unlawful motive for his termination related to a supervisor, Budd, who did not have decisionmaking authority to terminate plaintiff, but who recommended to the decisionmaker that plaintiff be fired due to certain alleged violations. *Russo*, 95 Fed. Appx. at 143.  In that case, the Sixth Circuit held that the decisionmaker who terminated plaintiff did not simply "rubber-stamp" Budd's recommendation, such that Budd's allegedly unlawful motive could be imputed to the decisionmaker. *Id.*  Although the decisionmaker

27

relied, in part, on information gathered by Budd, he also required the plaintiff to take a polygraph test regarding the violations, and, after plaintiff failed the test, ordered an evidentiary hearing presided over by a neutral decisionmaker. *Russo*, 95 Fed. Appx. at 143. The neutral made the independent determination that the plaintiff had committed the violations of which he was accused, the prescribed punishment for which was discharge. Because of these independent, neutral procedures, the Sixth Circuit held that there was no evidence to support a claim that the decisionmaker rubber-stamped Budd's recommendation.

In the present case, there is a reasonable basis to question whether the Strongsville Mayor relied primarily, if not fully, on Haney's recommendation. Although Mayor Ehrnfelt personally interviewed each candidate, his actions do not insulate the decision nearly to the same degree as the decisionmaker in *Russo v. Budd*. Indeed, if the Court determined that a brief interview (especially one in the presence of the allegedly biased decision-maker) removed any improper influence as a matter of law, municipalities would simply have to hold nominal interviews with the decisionmaker in employment decisions in order to remove the potential for liability. That, of course, cannot be the law, and summary judgment is not appropriate on this issue.

Defendants also argue that, because Acting Mayor Haseley, not former-Mayor Ehrnfelt, was the ultimate decisionmaker, he could not have relied exclusively on Haney's recommendation because he did not even talk to Haney. Instead, Defendants point to the fact that Mayor Haseley knew of former-Mayor Ehrnfelt's decision from the drafted, but unmailed, letters addressed to Branic and Tilbert, and that he did not question Mayor Ehrnfelt's decision. Defendants' argument as to this point, however, only bolsters the Court's conclusion. If accepted, it supports a finding that Mayor Haseley had all the more reason not to second-guess Haney's formal recommendations. The

28

evidence shows that Mayor Haseley was aware that Haney recommended Tilbert for the promotion and that Mayor Haseley did not review the performance evaluations before selecting a candidate. At worst, if Mayor Haseley felt that he was making the promotion decision *de novo*, the fact that Mayor Haseley made the ultimate decision with awareness of Haney's recommendation and without even interviewing the candidates is only more reason for a jury to conclude that he placed <u>absolute</u> reliance on Haney's recommendation.  At best, if Mayor Haseley felt bound by former-Mayor Ehrnfelt's decision, a jury could conclude that he was simply rubber-stamping a decision that itself, as explained above, could be determined to be the ratification of a tainted decision or the product of improper influence.  Under either scenario, Defendants' argument is not persuasive.

Based on the applicable law and evidence presented, the Court concludes that there are at least genuine issues of material fact as to the extent of Haney's influence on the mayor's decision, and as to whether the decision may be considered "independent" or whether Haney's alleged animus, if proven, may be imputed to the Strongsville mayors.[14]

---

[14]    The Court also recognizes, and Plaintiffs tangentially argue, that there may be grounds to find that Mayor Ehrnfelt or Mayor Haseley delegated authority to Haney, such that Haney's "decision" is itself chargeable to the municipality regardless of his potential influence on the mayor.  It is true that, even where a subordinate official (someone below the decisionmaker who does not have final authority to establish policy) makes a single decision, municipal liability may still be imposed if it is determined that the decisionmaker has delegated his policymaking authority to the subordinate official.  *See Pembaur*, 475 U.S. at 483 ("Authority to make municipal policy . . . may be delegated by an official who possesses such authority . . .").  In explaining the "special difficulties" that arise in a case where a plaintiff alleges that a policymaker has delegated his authority, the Supreme Court has set out some guiding principles. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-28 (1988).  Among those, the Court has explained that:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with <u>their</u> policies.  <u>If the authorized policymakers</u>
>
> (continued...)

29

iv.    **Qualified Immunity**

Defendant Haney also argues that he is entitled to qualified immunity on Count I.  Although Haney dedicates multiple pages setting out the general law of qualified immunity, the <u>entirety</u> of his case-specific argument relating to qualified immunity is quoted below:

> Defendant Haney submits that the law regarding speech and activity by union members in the public employer context is not clearly established.  This is reflected in the legal principle that  "<u>An employee's speech</u>, activity or association, <u>merely because it is union-related, does not touch on a matter of public concern</u>." *Anderson v. Ravenna Twp. Fire Dep't*, 159 Fed. Appx. 619, 625 (6th Cir. 2005) (citing *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003) (citing *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985)).  Accordingly, Defendant Haney submits that he's entitled to qualified immunity.

(Doc. 24 at p. 22).

Qualified immunity is an affirmative defense shielding government officials from liability as long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity inquiry has two steps.  "First, the court must determine 'whether the plaintiff has shown a violation of a constitutionally protected right.'" *Bukowksi v. City of Akron*, 326 F.3d

---

[14](...continued)

<u>approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final</u>.

*Id.* at 127 (emphasis of "their" in original; remaining emphasis added).  In addition, "[a] municipality may not escape *Monell* liability . . . by simply delegating decisionmaking authority to a subordinate official and thereafter studiously refusing to review his unconstitutional action on the merits."  *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994).

Although there certainly was no formal or official delegation of authority to Haney in this case, a court nonetheless might conclude that a delegation occurred under the principles of *Praprotnik*.  This Court does not address that issue, however, because it has already determined that there is a genuine issue of fact as to the causation element, based on Haney's recommendation to the mayor(s).

30

702, 708 (6th Cir. 2003) (quoting *Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998)).  "Then the court must discern whether the right is 'so clearly established that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In determining whether a right is "clearly established," the Sixth Circuit teaches that courts should look first to decisions of the Supreme Court, then decisions of the Sixth Circuit, and other courts within this Circuit, and then to decisions of other circuits.  *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

In the present case, as discussed above, there is an issue of fact as to the first step of a qualified immunity inquiry - whether there has been a violation of a constitutionally protected right. If Plaintiff establishes that such a violation has occurred, moreover, it is clear that Haney would not be entitled to qualified immunity because the right which Plaintiffs allege to have been violated is clearly established.  The passage from *Anderson* that Haney quotes in support of his assertion has already been addressed above.  It is clear that it cannot be given the meaning that Haney suggests the Court should give to it; rather, the Sixth Circuit's statement, more than twenty years ago, demonstrates the right which Plaintiffs allege is a clearly established right:

> We have <u>no doubt</u> that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering*.

*Boals*, 775 F.2d at 693 (emphasis added).  Defendant Haney, therefore, is not entitled to qualified immunity because there is a genuine issue of fact as to whether a constitutional violation occurred, and, if Plaintiff establishes that one did occur, then the right alleged is one that Plaintiff has shown is clearly established.

31

### b.    Count II - Freedom of Speech

In Count II, Plaintiffs allege that their right to freedom of speech was violated when, as a result of their speaking out on various issues and their open endorsement of Councilman DeMio for mayor, they were denied a promotion, threatened with retaliation on the job, and were subjected to efforts to silence their speech.  The Court again finds that genuine issues of material fact preclude granting judgment in Defendants' favor as a matter of law.

In Count II, there are two categories of speech that Plaintiffs' allege constitute constitutionally protected speech.  The first category relates to speech in which Plaintiffs allege they engaged regarding certain Fire Department policies and procedures.  The second category relates to Plaintiffs' endorsement, as Union members, of DeMio for Strongsville mayor.  Defendants argue that neither category constitutes speech on a matter of public concern, and, therefore, they are entitled to judgment as a matter of law.  The Court disagrees.

### i.    First Element - Constitutionally Protected Activity

As to the first category of speech, Plaintiffs allege that they spoke out on topics such as the need for a permanent lieutenant's position at Engine-5/Medic-5, inadequate fire fighter training and preparedness, inadequate fire station staffing, the Fire Department's failure to adhere to Standard Operating Procedures (SOPs) when responding to calls, the danger of sending out inexperienced fire fighters, and the Fire Department's failure to appropriately coordinate fire fighter dispatch services. Zerman testified at his deposition that he had personal conversations with Chief Haney in 2001 and 2002 about inadequate firefighter training and preparedness.  Zerman also testified that he had a conversation with Chief Haney in July 2001 regarding the need to have another officer at Engine-5/Medic-5.  Plaintiffs also allege that they spoke out about these issues at Union meetings, and that

32

Plaintiffs and the Union had taken a strong and vocal position on the "Engine-5/Medic-5 issue."

In support of their assertion that these topics are matters of public concern, Plaintiffs rely heavily on *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564 (6th Cir. 1997).  In *Chappel*, an employee of the fire district and ambulance district who was an emergency medical technician (EMT)/firefighter, brought suit against the fire district and ambulance district, the fire chief, and members of the fire board, alleging unlawful retaliation under the First Amendment.  *Id.* at 567.  In that case, Chappel spoke both privately to board members and openly at public meetings about complaints and concerns he had with the financial management of the fire and ambulance districts, nepotism in the fire district, and the lack of standard operating procedures (SOPs) and adequate training for fire district employes.  *Id.* at 568.  Local newspapers reported on those issues and, in particular, made reference to Chappel's comments on the issues at public meetings.  *Id.* at 569-70.  Chappel alleged that, in retaliation for his complaints, he was assigned to a less desirable station and, later, denied a paramedic job in the district.  *Id.* at 571.  On appeal, the Sixth Circuit addressed, *inter alia*, whether Chappel's speech regarding SOPs and firefighter training constituted speech on a matter of public concern, concluding that such speech did implicate matters of public concern.  There, the Court held that:

> Speech on matters directly affecting the health and safety of the public is obviously a matter of public concern.  (citations omitted).  Indeed, "[f]ew subjects are of more public concern . . . than the provision of basic fire and rescue services."  *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995).
>
> \*      \*      \*      \*
>
> For similar reasons, we find that Chappel's speech regarding the need for SOPs and improved training was speech on a matter of public concern.  Firefighters train and operate to serve and protect the public from significant dangers.  Indeed, we are somewhat mystified by the defendants' casual suggestion that "[t]he public would have a very limited interest . . . in whether the Fire Department had a SOP or whether specific firefighters desired additional training."  Chappel's speech on these issues

33

was clearly within the ambit of the First Amendment's protection.

*Id.* at 578-79 (emphasis added).

In reaching its conclusion, the Sixth Circuit rejected arguments by the defendants in that case that Chappel's speech was driven purely by private interest because he hoped to secure a job for himself, and that his <u>private</u> speech to board members could not be speech on a matter of public concern. *Id.* In addressing the first argument, the Court explained that "[e]ven if we were to assume that Chappel's predominant motivation for speaking was securing a job for himself, we would not conclude that this motivation so dominated the substance of Chappel's speech that the 'point' or 'communicative purpose' of his speech was rendered merely a matter of personal concern." *Id.* at 578. The Court reasoned that his personal motivation did not outweigh the public interest character of the speech because Chappel's speech touched matters "near the zenith" of public concern, was made in public fora, and because the newspapers' interest in the topic reflected the public significance of Chappel's speech. *Id.* As to the second argument, the Court noted that "[c]onstitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public." *Id.* at 579.

In the present case, Defendants do not recognize, address, or attempt to distinguish *Chappel*. Instead, Defendants argue primarily that the issue on which Plaintiffs were most vocal - the "Engine-5/Medic-5 issue" - is not a matter of public concern because Plaintiffs wanted the lieutenant position created so that one of them could be promoted to the position. In addition, Defendants contend that the issue was discussed for over ten years, meaning that it could not have been a safety issue. Finally, Defendants argue that each of the topics on which Plaintiffs allegedly spoke out were not matters of public concern because Plaintiffs could not recall specific instances where the public was

34

put in danger by lack of training, failure to adhere to SOPs, or other similar concerns which Plaintiffs addressed.

The Court concludes that, while not all matters about which Plaintiffs complained were matters of public concern, a significant portion of their speech qualifies as such. Defendants' failure to acknowledge *Chappel* is glaring. Although there are legitimate grounds on which *Chappel* may be distinguished, it is not the Court's obligation to manufacture arguments on Defendants' behalf, especially in the face of such unequivocal statements as "few subjects are of more public concern . . . than the provision of basic fire and rescue services" and "Chappel's speech regarding the need for SOPs and improved training was speech on a matter of public concern." *Chappel*, 131 F.3d at 578-79. At least a significant portion of Plaintiffs' speech in this case relates to the precise topics considered in *Chappel* and deemed to be speech on matters of public concern. *Chappel*, therefore, heavily informs the Court's conclusion.

It is true, of course, that whether speech is deemed to be on a matter of public concern is determined on a case-by-case basis according to content, form, and context of the speech, and, therefore, this Court cannot simply rest on the holding of *Chappel*. It is true, moreover, that speech which merely criticizes the efficiency or adequacy with which a public department or agency is operated is not generally a matter of public concern. Indeed, the Sixth Circuit repeatedly has explained that the mere fact that tax payer dollars are used in governmental operations does not transform every complaint about those operations into a matter of public concern. *See Chappel*, 131 F.3d at 576 ("[T]he mere fact that public monies and government efficiency are related to the public employee's speech does not, itself, qualify that speech as being addressed to a matter of public concern.") (quoting *Barnes v. McDowell*, 848 F.2d 725, 734 (6th Cir. 1988)).

In addition, many public employees, even those whose jobs are far removed from public safety, can argue that they engage in activities that have a *tangential* relationship to public safety. Indeed, an inherent aspect of public service is that, at least to some degree, it affects the public. This does not mean, however, that all speech pertaining to the jobs of such employees or to their employer's policies or procedures touch on matters of public concern simply because their jobs are *peripherally* related to public safety.

Recognizing these limitations, however, does not compel the result Defendants espouse. The connection between Plaintiffs' speech and matters that are truly of public concern goes well beyond the mere fact that tax payer dollars fund the Fire Department. In addition, Plaintiffs' speech in this case is an exception to the general rule that complaints by public employees about internal procedures do not constitute matters of public concern. First, Plaintiffs are firefighters who provide fire and rescue services; the primary purpose of their jobs is to protect the public from harm. Indeed, few public employees are tasked so directly with protecting public safety. Second, Plaintiffs' speech in this case related directly to the manner in which they, and their fellow firefighters, are able to carry out their duties to effectively protect the public. In *Chappel*, the Sixth Circuit made clear that speech made regarding this precise type of job, and this precise subject, addressed matters "that are rightly 'near the zenith' of public concern." *Chappel*, 131 F.3d at 578.

Ultimately, after a careful consideration of *Chappel* and a comparison between the speech at issue there and that at issue here, the Court finds that there are enough similarities for this Court to reach the same conclusion as the Sixth Circuit reached in *Chappel*. In this case, although Plaintiffs' speech was not in public fora as in *Chappel* (or, to the extent it occurred at Union meetings, at least not <u>as</u> public of fora), and it was not reported by newspapers, it is nonetheless

36

deserving of First Amendment protection.  The content, according to the *Chappel* Court, touched on matters that are "near the zenith" of public concern, and Plaintiffs' produced evidence that several firefighters felt that the "Engine-5/Medic-5 issue" was a safety issue.  Further, the fact that another lieutenant's position possibly might have benefitted Plaintiffs, or that much of the alleged speech was not through public channels, does not remove the speech at issue in this case from the realm of public concern.  The Court concludes, therefore, that the topics addressed in Plaintiffs' first category of speech were matters of public concern.

As to the second category of Plaintiffs' speech - the endorsement of DeMio for Strongsville mayor - the Court's inquiry can be more brief.  Defendants primarily argue that Plaintiffs' endorsement of DeMio does not touch on a matter of public concern because O.R.C. § 124.57, known as the "Little Hatch Act," restricts state employees from participating in politics.  Defendants point out that, in this case, there was no adverse action because the Little Hatch Act was never even applied to Plaintiffs.  Once again, Defendants miss the point.  The Court's inquiry is not whether the Little Hatch Act prohibits Plaintiffs' endorsement of a political candidate (indeed, Defendants point out they never invoked that act).  The inquiry is whether Plaintiffs' endorsement is constitutionally protected speech; the mere existence of the Little Hatch Act does not resolve that question.

Instructive on this point are two Supreme Court cases, *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion), and *Branti v. Finkel*, 445 U.S. 507 (1980), and their progeny.  As the Sixth Circuit has explained, "[t]he *Elrod/Branti* line of opinions circumscribes the conditioning of employment on, or the termination of employment because of, an individual's political beliefs or affiliations."  *Carver v. Dennis*, 104 F.3d 847, 850 (6th Cir. 1997).  As a plurality of the Supreme Court explained in *Elrod*:

37

> Patronage . . . to the extent it compels or restrains belief and association is inimical to the process which undergirds our system of government and is "at war with the deeper traditions of democracy embodied in the First Amendment." As such, the practice unavoidably confronts decisions by this Court either invalidating or recognizing as invalid government action that inhibits belief and association through the conditioning of public employment on political faith.

*Elrod*, 427 U.S. at 357 (citations omitted). The Supreme Court later extended the rule of *Elrod* and *Branti* not just to termination, but also to "promotion, transfer, recall, and hiring decisions based on party affiliations and support . . ." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990).

In addition to the *Elrod/Branti* line of cases, at least the Seventh Circuit has held expressly that "public endorsement of a candidate for public office is an expression of views that is within the protection of the First Amendment." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (addressing a First Amendment retaliation claim and distinguishing between the mere fact of a public employee's candidacy and her endorsement of another candidate, finding the latter to be protected by the First Amendment).

Pursuant to the well-established principles outlined in these cases, public employees may not be denied promotion solely because of their political beliefs or affiliations. Accordingly, to the extent that Defendants argue that the Little Hatch Act permits them to make promotion decisions based on political association, they are clearly mistaken. Indeed, for purposes of a First Amendment retaliation claim, a union's endorsement of a political candidate is precisely the sort of expression that can be characterized as being of "political, social, or other concern to the community." Based on those cases, the Court concludes that Plaintiffs' endorsement of a political candidate is speech deserving of First Amendment protection against retaliation.

The Court, therefore, concludes that Plaintiffs' speech in this case was speech on a matter

38

of public concern.  Because Defendants do not argue that Plaintiffs' speech was disruptive to the efficient functioning of the Fire Department, the Court does not reach the balancing inquiry of the *Pickering*/*Connick* analysis.

### ii.      Second Element - Adverse Action

As noted above, there is no dispute that the failure to promote is an "adverse action" for purposes of a First Amendment retaliation claim.  *See Thaddeus-X*, 175 F.3d at 396 ("The term 'adverse action' [in the retaliation context] is drawn from employment case law; examples in that context include discharge, demotions, refusal to hire, nonrenewal of contracts, and <u>failure to promote</u>. (emphasis added)).  As such, Plaintiffs' have satisfied the second element of this claim in Count II.[15]

### iii.     Third Element - Causation

As noted above, causation generally is an issue that must be decided by the jury.  *Matulin*, 862 F.2d at 613; *Hadad*, 970 F.Supp. at 1241.  The causation element of Plaintiffs' claim in Count II, just as with Count I, is no exception.  For many of the same reasons discussed in Count I, there are genuine issue of material fact that preclude granting summary judgment in Defendants' favor on this issue.  Further, many of the topics on which Plaintiffs spoke out are so intertwined with their activities as Union members, and, therefore, their First Amendment right to association, that summary judgment may not be granted on this claim.  Because the two claims are so intertwined, the Court will only briefly review its reasoning as to this claim.

---

[15]  Like Count I, because the Court concludes that Count II survives summary judgment, it does not address whether the other retaliatory acts that Plaintiffs allege are "adverse actions" for purposes of a First Amendment retaliation claim.

Again, Defendants make the same argument: "Absent evidence that the appointing authority knew about Plaintiffs' speech, there obviously cannot have been retaliation in response to that speech." (Doc. 23-1 at p. 1). For the reasons explained above, that argument misses the point. Haney certainly was aware of Plaintiffs' speech, as the evidence shows that Zerman had direct conversations with Haney regarding many of the topics which the Court has determined constitute matters of public concern. The evidence also demonstrates Haney's displeasure with such speech, a point that Defendants do not try to refute. Finally, as explained above, there is at least a genuine issue as to the extent of Haney's influence on the promotion decision made by acting Mayor Haseley. For those reasons, summary judgment is inappropriate.

One point, however, warrants further discussion. Defendants argue that, because the Union did not formally endorse DeMio for mayor until June 18, 2003, which was two weeks <u>after</u> Tilbert was promoted to lieutenant instead of Plaintiffs, retaliation for the endorsement is a causal impossibility. Although Defendants' argument facially has merit, Plaintiffs have presented enough evidence to defeat summary judgment. Specifically, Plaintiffs have presented evidence that the Union was considering endorsement prior to its formal endorsement and that Haney may have been aware of that fact. For example, Rozman told Union members at a meeting in spring 2002, one year before the formal endorsement, that the Union was considering supporting DeMio, but declined to do so at that time because of long-time Mayor Ehrnfelt's political clout. In addition, acting Mayor Haseley testified at his deposition that, while he did not know prior to the Union's formal endorsement that they were considering supporting DeMio, he <u>assumed</u> they would. (Haseley Dep. 43:12-15). Although not overwhelmingly compelling, this circumstantial evidence is enough to preclude summary judgment on this issue.

40

Underscoring the Court's conclusion is the fact that Plaintiffs' other protected activities - particularly their Union association - are so intertwined with its endorsement of DeMio that a determination as to one informs a determination as to the other.  For purposes of summary judgment, the Court need not parse out whether and to what extent Defendants' actions may have been motivated by Plaintiffs' Union activities, Plaintiffs' speech on fire fighter training or staffing issues, or their endorsement of DeMio.  It is enough that the Court finds that those activities are constitutionally protected, that Plaintiffs suffered an adverse action, and that there is at least a genuine issue of material fact as to whether the adverse action was motivated, at least in part, by the exercise of those protected rights.

The Court, therefore, denies Defendants' motion for summary judgment as to Count II.

### c.        Count III - Right to Petition (ULP Charge)

In Count III, Plaintiffs claim that their right to petition the government for redress was violated when, after they filed the ULP charge with the SERB for improper denial of a promotion, they were denied a promotion, threatened with retaliation on the job, and were subjected to "extreme scrutiny" on a daily basis.  As noted above, *infra* at n. 8, it is logically impossible that denial of a promotion could be retaliation for filing a ULP charge challenging the very denial of the promotion that had already occurred.  The Court, therefore, views only the other two instances of alleged retaliation - being threatened with retaliation and being subjected to extreme scrutiny - as the alleged "adverse actions" of Count III.  Even taking only those two alleged adverse actions, the Court still finds that there are genuine issues of material fact that preclude summary judgment on this count.

41

i.      **First Element - Constitutionally Protected Activity**

Defendants argue that Plaintiffs' filing of the ULP charge is not a matter of public concern because it is merely a private employment dispute.  Although Defendants are correct that a private employment dispute does not become a matter of public concern merely because it is filed as a "union grievance," the ULP charge in this case is, in fact, more than just a private employment dispute.  Because the ULP charge relates not just to the promotion of these Plaintiffs but the general promotional procedure in the entire Strongsville Fire Department, and because it addresses matters of illegal discrimination on the basis of Union activity, the ULP charge in this case does implicate matters of public concern.

The ULP charge does not relate only to Plaintiffs but to all future candidates for promotion.  Indeed, the result of the ULP charge was an agreement in which the entire promotion procedure was modified for all future promotions.  Significantly, the settlement did not alter the employment status of Plaintiffs, indicating that the dispute went beyond the one promotion decision affecting Plaintiffs.  In addition, the ULP addresses matters relating to illegal discrimination based on anti-Union bias within the Fire Department, as reflected by the arbitrator's interim Opinion and Award, which contained the finding that "[t]he record supports a finding that there is a reasonable probability that there is some anti-union animus present in parts of the Department." (Doc. 29-37 at 10, 16.)  As discussed above in the portion of this opinion addressing Count I, Plaintiffs' Union activity and association in this case constitute matters of public concern.  Again, Plaintiffs' ULP charge is somewhat intertwined with its activity as Union members.  For these reasons, the Court concludes that Plaintiffs' action in filing the ULP charge is speech on a matter of public concern.

42

### ii.      Second Element - Adverse Action

Plaintiffs allege that, as a result of filing their ULP charge, they were threatened with retaliation on the job and subjected to extreme scrutiny on a daily basis.  Plaintiffs make the general allegation that "the record is replete with indicia of years of on-the-job harassment and intimidation suffered by the plaintiffs of a character that would dissuade a person of 'ordinary firmness' from speaking out on matters of public concern and from engaging in associational activities."  (Doc. 29 at 16).  Plaintiffs, however, do not point to any specific instance of retaliation other than negative performance evaluations, which Plaintiffs do not allege were in response to filing the ULP charge but in response to informing the City of their intent to file the present lawsuit.  In response, Defendants argue that threats and intimidation do not form the basis of an injury cognizable through § 1983.

The proper standard to determine whether Plaintiffs' injury is cognizable through § 1983 in this case is the "person of ordinary firmness" standard, as clarified by the Sixth Circuit in *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999).  In describing that standard, the Sixth Circuit explained that "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment."  *Id.* at 398.  The Sixth Circuit has further explained that "[t]he standard is an attempt to balance the tension between two propositions: First, the injury suffered need not be great because there is no justification for harassing people for exercise of their constitutional rights; but second, a constitutional tort – like any tort – requires injury, and allowing constitutional redress for every minor harassment may serve to trivialize the First Amendment."  *Mattox*, 183 F.3d at 521.

43

Among the threats that Plaintiffs contend were in retaliation for the ULP charge in this case is the threat by Haney, following the meeting with Rozman to discuss informal resolution of the ULP charge, in which Haney told Captain Higginbotham that he wanted to look into disciplining and possibly terminating Rozman. Higginbotham shared Haney's comments with Rozman. Plaintiffs do not point to any other specific retaliatory act in connection with the ULP charge. The issue, therefore, is whether Haney's threat of discipline or termination is an "adverse action" for purposes of a First Amendment retaliation claim.

The Court concludes that, in the circumstances of this case, it does constitute an adverse action. Although it is not an egregious retaliatory act, the Court believes that it is nonetheless more than an inconsequential action or minor harassment contemplated by the Sixth Circuit in setting out the standard for adverse actions in *Thaddeus-X*. This conclusion is made in light of the fact that there is at least a question of fact as to Haney's anti-Union animus and whether Plaintiffs were denied a promotion on that basis. Given that past history, a threat of this nature carries an even greater chilling effect. The Court finds, therefore, that Plaintiffs have satisfied the second element of their claim in Count III.

### iii.    Third Element - Causation

In this case, the threat against Rozman was made directly after a meeting between Rozman and Haney, the purpose of which was to attempt to informally resolve the subjects raised in Plaintiffs' ULP charge. Haney claims he wanted to discipline or terminate Rozman because he felt that Rozman was blackmailing him, not because of the ULP charge. Given the timing of the threat and the subject of the meeting, however, there is clearly a genuine issue of material fact as to whether

44

Defendants' adverse action was motivated, at least in part, by Plaintiffs' constitutionally protected activity.

### d.    Count IV - Right to Petition (Intent to File Lawsuit)

In Count IV, Plaintiffs allege that their right to petition the government for redress was violated when, as a result of their notification to the Strongsville City Law Director that they intended to file this lawsuit, Plaintiffs Zerman and Nieberding received negative performance evaluations, and all Plaintiffs were denied a promotion, threatened with retaliation on the job, and subjected to "extreme scrutiny" on a daily basis.  Plaintiffs allege that they notified the City of their intent to file this suit on October 1, 2004.  As with Plaintiffs' claim in Count III, it is not logically possible that the denial of the promotion was in retaliation for this act because that denial occurred over a year and half before Plaintiffs notified the City that they planned on filing this lawsuit.  In addition, Plaintiffs do not identify any other specific retaliation or extreme scrutiny to which they were subjected.[16]  The Court, therefore, treats Plaintiffs as alleging only the negative performance evaluations of Zerman and Nieberding as the adverse actions.

As to this claim, the Court concludes that Defendants are entitled to judgment as a matter of law.  The Court need not determine whether Plaintiffs' notification of their intent to file a lawsuit (as opposed to the actual filing of the suit) is constitutionally protected speech.  In addition, it does not address whether the lawsuit itself touches on matters of public concern, which may be questioned

---

[16]   Although there is evidence that Rozman told Haney that he would file lawsuits against Haney during his meeting regarding the ULP charge, Plaintiffs do not allege that it was at this meeting that Plaintiffs notified the City.  Indeed, Count IV of the complaint specifically references October 1, 2004 as the date of notification.  The Court, therefore, does not consider Plaintiffs' to have alleged that Haney's threat to discipline or terminate Rozman, which occurred on August 22, 2003, was in retaliation for their notification to the City of their intent to sue.

45

because, unlike the ULP charge, it relates only to the one promotion decision affecting these Plaintiffs.  The Court instead finds that Defendants are entitled to summary judgment on this claim because the "negative" performance evaluations - the only retaliation the Court views to be alleged - do not constitute adverse actions for purposes of a First Amendment retaliation claim.

As noted in the background section, Plaintiffs argue that Zerman's evaluation was negative because, although he was rated with an "above standard" score, he received comments that he needed to work on his communication with management and to work through unpopular decisions by the administration.  Nieberding received a "meets standard" rating for 2003 and 2004, a rating he received only once before, in 2001.  Although firefighters have an opportunity to submit comments on their evaluations, Nieberding only did so for his 2003 evaluation, admitting that he felt his 2004 evaluation was "fair."  (Nieberding Dep. 23:2-5.)  In his 2003 evaluation, Nieberding took issue with the comment that he would benefit from continuing education in certain areas.  Plaintiffs argue that the "meets standard" rating and the comments on Nieberding's evaluation constitute adverse actions.

The Court does not agree that these performance evaluations amount to an injury cognizable through § 1983.  As Defendants point out, it is not even clear that these evaluations can be characterized as negative.  Zerman, for example, received the exact same rating he had received for the previous three years, well before he applied for the promotion.  The mere inclusion of comments on an "above standard" evaluation does not transform the evaluation into a negative one.  In addition, Nieberding previously had received a "meets standard" evaluation in 2001, before he applied for the promotion, and the comments on his evaluation are even more benign.  Plaintiffs do not indicate any adverse effect that either of these so-called negative evaluations had on them.  In short, these performance evaluations do not rise above the de minimis threshold required for injuries in First

46

Amendment retaliation claims; to hold otherwise would "serve to trivialize the First Amendment." *Mattox*, 183 F.3d at 521.   As such, the Court concludes that Defendants are entitled to summary judgment on Count IV of Plaintiffs' complaint.

## IV.    CONCLUSION

For the reasons just stated, the Court **GRANTS in part** and **DENIES in part** Defendants' Motions for Summary Judgment.  Counts I, II, and III of Plaintiffs' complaint survives summary judgment, but Defendants are entitled to judgment as to Count IV.  In addition, the Court **DENIES** the parties' respective Motions to Strike.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 28, 2006**

47